**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA—EASTERN DIVISION

| | |
|---|---|
| GIL HODGES, individually and on behalf of all other persons similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>OPTUM INC.,<br><br>  Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

1

## **TABLE OF CONTENTS**

2

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ..................................................................... 1

THE PARTIES ................................................................................................ 3

FACTUAL ALLEGATIONS ......................................................................... 4

    I.    The California Information Privacy Act ................................................. 4

    II.   The California Confidentiality of Medical Information Act ................. 6

    III.  The Federal Wiretap Act ....................................................................... 8

    IV.  Defendant's Website ............................................................................. 8

    V.   Adobe's Tracking Technology............................................................. 19

    VI.  Defendant Aids, Agrees With, Employs, and Otherwise Enables Adobe to Wiretap Californians' Communications.................. 23

    VII. Defendant Enables Adobe to Pair the Above Data with Users' Identities ................................................................................... 28

    VIII. Tolling ................................................................................................ 36

CLASS ALLEGATIONS ............................................................................. 37

CAUSES OF ACTION ................................................................................. 39

PRAYER FOR RELIEF ............................................................................... 55

DEMAND FOR JURY TRIAL ................................................................... 56

Plaintiff Gil Hodges ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Optum Inc. ("Optum" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of a class and subclass of all persons in the United States and residents of California, respectively, who, during the class period, had their personally identifiable information ("PII") and/or protected health information ("PHI") improperly intercepted by or otherwise disclosed to third-party Adobe Inc. ("Adobe"), as a result of using the Optum website (available at optum.com, hereinafter, the "Website"), which is owned, operated, and controlled by Defendant.

2.    Defendant aids, employs, agrees with, and otherwise enables Adobe to intercept Plaintiff's and Class Members' communications while using the Website, including communications containing PII and/or PHI. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.    The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, and there is minimal diversity.

4.    The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, and Defendant assisted Adobe with intercepting Plaintiff's communications in this District.

5.      As detailed below, Defendant purposefully, systematically, and repeatedly reached into and targeted California in connection with marketing, promoting and otherwise making available the health services specifically offered to California residents, including Plaintiff, via the Website.

6.      Defendant is "a leading medical group in Southern California for members in Los Angeles, Orange, San Diego, Riverside and San Bernardino counties."[1] As such, Defendant operates brick and mortar clinics in these counties, including but not limited to clinics in Los Angeles County[2] and Orange County.[3]

7.      The Court also has specific personal jurisdiction over Defendant because Defendant "obtain[ed] valuable personal data about California consumers for its own commercial gain." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 756 (9th Cir. 2025) (en banc). Through those business activities, Defendant tortiously violated Plaintiff's and Class Members' privacy through its collection, maintenance, and sale of valuable personal data from California consumers. *Id.*

8.      Moreover, Defendant purposefully directed its activities at California by operating and designing its Website with the intent to cultivate an audience and obtain patients in California, as evidenced by its content with a California-specific focus. For instance, when a patient uses Defendant's Website, and goes through the process of searching for care or filling out a form to become a patient, the user must choose which state they are located in. *See infra* ¶¶ 41, 48. One of the states that Defendant provides as an option is California. *See id.*

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

---

[1] OPTUM, OPTUM CALIFORNIA, https://www.optum.com/en/care/locations/optum-california.html.

[2] OPTUM, OPTUM - WESTERN SAN PEDRO, https://www.optum.com/en/care/facilities/ca/optum-western-san-pedro-46397806.html.

[3] OPTUM, OPTUM - CYPRESS, https://www.optum.com/en/care/facilities/ca/optum-cypress-62494907.html.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE PARTIES**

***Plaintiff Gil Hodges***

10.    Plaintiff Gil Hodges is an adult citizen of the state of California and is domiciled in San Bernardino, California.

11.    In or around August 2023 and August 2025, Plaintiff Hodges visited the Website on the Google Chrome web browser. Plaintiff Hodges was in California each time he visited the Website. Upon accessing the Website, Plaintiff searched for an ophthalmologist, and for primary care doctors.

12.    Because Plaintiff accessed the Website to search for an ophthalmologist and for primary care doctors, and because of Defendant's actions as alleged herein, Plaintiff's use of the Website has led to the unlawful interception of and/or disclosure of his medical information, including information regarding his medical condition, history, and treatment.

13.    Specifically, as a result of Defendant's unlawful conduct as alleged herein, third-party Adobe intercepted information about the medical consultations Plaintiff and Class Members scheduled on the Website—namely, the state where they are seeking care, the particular search queries and care categories selected by users, the preferred gender of the doctor they wish to see, the name of the doctor they select, and/or the particular facility they select.

14.    Pursuant to the systematic process described herein, Defendant assisted third-party Adobe with intercepting Plaintiff's communications, including those that contained PII, PHI, and related confidential information. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

15.    By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and PHI.

///

///

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                           3

1

***Defendant Optum Inc.***

2   16. Optum Inc. ("Optum" or "Defendant") is incorporated in Delaware and

3 has its principal place of business at Eden Prairie, Minnesota 55344.  Defendant

4 facilitates a variety of health care services for its users, including but not limited to

5 primary care, ob/gyn, radiology, urgent care, and virtual care.[4]  Users can search for

6 healthcare providers and services, and become a patient to manage their treatment or

7 diagnosis of medical conditions, on Defendant's Website.

8       **FACTUAL ALLEGATIONS**

9 **I.**  **The California Information Privacy Act**

10   17. The California Legislature enacted the Invasion of Privacy Act to protect

11 certain privacy rights of California citizens. The legislature expressly recognized that

12 "the development of new devices and techniques for the purpose of eavesdropping

13 upon private communications … has created a serious threat to the free exercise of

14 personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal

15 Code § 630.

16   18. The California Supreme Court has repeatedly stated an "express

17 objective" of CIPA is to "protect a person placing or receiving a call from a situation

18 where the person on the other end of the line *permits an outsider to tap his telephone*

19 *or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

20   19. Further, as the California Supreme Court has held in explaining the

21 legislative purpose behind CIPA:

22     While one who imparts private information risks the betrayal of

23     his confidence by the other party, a substantial distinction has
     been recognized between the secondhand repetition of the

24     contents of a conversation and its *simultaneous dissemination to*

25     *an unannounced second auditor, whether that auditor be a*
     *person or mechanical device.*

26

27 ———————————
 [4] *See* OPTUM, *Specialty care and services*, https://www.optum.com/en/care/specialty-

28 care.html (last accessed November 4, 2025).

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

20.　　As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

21.　　CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

22.　　As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

23.　　A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

24.　　Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    The California Confidentiality of Medical Information Act

25.    Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "[a] provider of health care … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c)."    Cal. Civ. Code § 56.10(a).[5] "An authorization for the release of medical information … shall be valid if it meets the following conditions:"

(1) Is handwritten or is in a typeface no smaller than 14-point type.

(2) Is clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization.

(3) Is signed … and dated …

(4) States the specific uses and limitations on the types of medical information to be disclosed.

(5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(6) States the name or functions of the persons or entities authorized to receive the medical information.

(7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(8) States an expiration date or event. The expiration date or event shall limit the duration of the authorization to one year or less, unless the person signing the authorization requests a specific date beyond a year or unless the authorization is related

---

[5] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place.  For example, Defendant could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena.  *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

to an approved clinical trial[.]

(9) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

26.     Additionally, "a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."  Cal. Civ. Code § 56.10(d).

27.     Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' PII and PHI. Cal. Civ. Code § 56.36(c).[6] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

28.     "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: (1) ... nominal damages of one thousand dollars ($1,000).  In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. (2) The amount of actual damages, if any, sustained by the patient."  Cal. Civ. Code § 56.36(b).

///

---

[6] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101(a).

### III.    The Federal Wiretap Act

29.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

30.    Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

31.    Persons who have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

### IV.    Defendant's Website

32.    Defendant Optum facilitates a variety of health care services for its patients such as primary care, specialty care, urgent care, virtual care, chronic condition care, and outpatient surgery.[7]

33.    Users of Defendant's Website can search to find care and become a patient online, to access medical care and manage their treatment or diagnosis of medical conditions.

34.    Users may search for providers and/or care locations through Defendant's

---

[7] *See* OPTUM, *Health Care*, https://www.optum.com/en/care.html (last accessed Nov. 4, 2025).

search function, which allows patients to "[s]earch by provider, specialty or category" and also "[b]rowse categories" of care.[8]

35.    After finding a provider and/or care location that best suits their needs, users can submit a form to become an Optum patient—without ever leaving home.

36.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, and otherwise enables Adobe to eavesdrop on those confidential communications using Adobe's wiretaps, as set out *infra*.

37.    Defendant has integrated Adobe's wiretaps into the Website. Through the integration of Adobe's tracking technologies,[9] Defendant assisted Adobe with intercepting and otherwise obtaining the identities and communications of Defendant's Website users, including communications related to the type of medical treatment that Website users were seeking and/or for which they submitted a form to become a patient.

38.    Website users' confidential communications are the product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from users conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users, *e.g.*: (1) information created by and in response to users' communicative inputs; (2) information created by and in response to users' intended messages to the Website, and Defendant; and (3) information created by the Website in response to users'

---

[8] OPTUM, *Find care in California*, https://www.optum.com/en/care/locations/optum-california/find-care.html? (last accessed Nov. 4, 2025).

[9] *See, e.g.*, ADOBE, MARKETO ENGAGE | SETUP STEPS, https://experienceleague.adobe.com/en/docs/marketo/using/getting-started/initial-setup/setup-steps; ADOBE, ADOBE ENTERPRISE DOCUMENTATION, https://experienceleague.adobe.com/en/docs; ADOBE, TAGS OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/home.

---

having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses. Adobe, as installed and integrated by Defendant, contemporaneously intercepts Website users' button clicks selecting such services. Further, Defendant discloses the same information to Adobe.

39.    When a user enters optum.com they are prompted to "[f]ind care near you[.]" *See* Screen 1.



"Screen 1"

40.    Next, users are prompted to "[f]ind doctors and locations near you[.]" *See* Screen 2A. To do so, users may select between one or more "[c]are options" provided by Optum. *See id*. Alternatively, users may use the list to "find care in another state[.]" *See* Screen 2B. Users click on a particular state and then click "[f]ind care[.]" *See* Screens 2B and 2C ("Find care in California").

///

///

1

2

3

4

5

6

7

8

9

10

11



**"Screen 2A"**

12

13

14

15

16

17

18



**"Screen 2B"**

19

20

21

22

23



**"Screen 2C"**

24

25        41.    If users had selected "[f]ind care in California" (*supra* Screen 2C), users

26   are brought to a new page where users may "[s]earch by provider, specialty or

27   category[.]" *See* Screen 3.  Users may type a search inquiry into the search bar.  *See*

28

1     *id.* Alternatively, users may select a care category: either (1) "[p]rimary care" or (2)

2     "[u]rgent care[.]" *See id.*



"Screen 3"

42.     Users who searched for a provider, specialty, or care category using the
search bar (*see supra* Screen 3) are brought to a results page, where users may further
refine their search. *See* Screen 4A. And users who selected a particular care category
(*see supra* Screen 3) are brought to a substantially similar screen. *See* Screen 4B.

///

///

///

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12



"Screen 4A"

13
14
15
16
17
18
19
20
21
22
23
24
25



"Screen 4B"

26    43.    On the results page, users can click one or more drop-down arrows to

27  "[f]ilter" their results and find the provider or location that best suits their needs.

28

Filters include, but are not limited to: "Providers and Locations[,]" "Specialty[,]" "Gender[,]" and "Language[.]"  *See* Screens 5A-5E.  Users click "Apply" to apply these filters.  *See id.*



44.     Afterwards, users are provided with a list of providers or locations.  *See* Screen 6A (list of providers); Screen 6B (list of locations).  Users can select a provider or location from the list of "results."  *See id.*

///
///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11



"Screen 6A"

12
13
14
15
16
17
18
19
20
21
22



"Screen 6B"

23
24      45.    When users click on a specific provider (*see supra* Screen 6A), they are
25   taken to that provider's page, *see* Screen 7A, where users can read more "[a]bout" that
26   provider, *see* Screen 7B.  Patients can also read about that provider's education and
27   reviews left by other patients.  *See* Screen 7C.
28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    15

1
2
3
4
5
6
7
8



"Screen 7A"

9
10
11
12
13
14
15
16



"Screen 7B"

17
18
19
20
21
22
23
24
25



"Screen 7C"

26   ///
27   ///
28

46.    The provider's page also lists the address of the clinic where the provider is currently "[s]eeing patients[.]"  *See* Screen 8.  Defendant asks that patients to "contact the clinic directly to schedule and confirm appointment availability."  *See id.*



"Screen 8"

47.    Clicking on a particular clinic brings users to that clinic's page.  *See* Screen 9.



"Screen 9"

///
///
///
///
///

48.    On the provider page and the clinic page, users have the option to "[b]ecome a patient." *See supra* Screen 9; *see also* Screen 10. Clicking "[b]ecome a patient" takes users to a form where users are required to provide their first and last name, email, phone number, date of birth, state, and zip code. *See* Screen 11. Finally, users click "[s]ubmit" to submit their form to become a patient. *See id.*



"Screen 10"



"Screen 11"

49.    After users fill out the form, Optum reaches out to users.  *See* Screen 12; *see also supra,* Screen 11.



"Screen 12"

## V.    Adobe's Tracking Technology

50.    Adobe wiretaps the Website with its tracking technologies, which Defendant purposefully installed on the Website. Additionally, because Defendant purposefully installed Adobe's tracking technologies on the Website, Defendant also discloses its Website users' PHI and PII to Adobe.

51.    Adobe's tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to Adobe's servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Adobe at the same time as they are being sent to Defendant. Thus, Adobe's interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting

an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

52.    Specifically, Adobe wiretaps the Website with trackers associated with "Marketo Engage."[10]  "Adobe Marketo Engage is … [a] marketing automation platform"[11] that "enables marketers to manage personalized multi-channel programs and campaigns to prospects and customers."[12] "Marketing automation enables [clients like Defendant] to streamline, automate, and measure marketing tasks and workflows so [clients like Defendant] can increase operational efficiency and grow revenue

---

[10] *See, e.g.*, MARKETO DEVELOPER GUIDE, JAVASCRIPT API (last updated Sept. 28, 2025), available at https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/javascript-api; *see also, e.g.*, MARKETO DEVELOPER GUIDE, ADOBE EXPERIENCE CLOUD INTEGRATIONS OVERVIEW (last updated Sept. 21, 2025), available at https://experienceleague.adobe.com/en/docs/ marketo/using/ product-docs/adobe-experience-cloud-integrations/adobe-experience-cloud-integrations-overview.

[11] ADOBE, ADOBE MARKETO ENGAGE DOCUMENTATION, available at https://experienceleague.adobe.com/en/docs/marketo-engage (last accessed Nov. 10, 2025).  *See also* ADOBE, WHAT IS ADOBE MARKETO ENGAGE?, available at https://experienceleague.adobe.com/en/docs/marketo/using/getting-started/what-is-adobe-marketo-engage (last accessed Dec. 1, 2025) (stating Marketo Engage is a "marketing automation software").

[12] MARKETO DEVELOPER GUIDE, GETTING STARTED (last updated October 19, 2025), available at https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/getting-started.

---

faster."[13]

53.    Marketo Engage relies, in large part, on the "Munchkin Tracking Code."[14]

54.    Adobe explains that "Munchkin is the JavaScript snippet you put on your website. **It tracks visits, clicks, and form fill outs**."[15] More specifically, "Marketo's Munchkin JavaScript allows for tracking of end-user page visits and clicks to your Marketo landing pages and external web pages."[16]

55.    "The default behavior of Marketo Munchkin is to do the following on page load:

1. Check to see if the current browser has a Munchkin cookie and create one if it is not there.

2. Send a 'Visit Web Page' event to the designated Marketo instance using the information from the current page and browser. This records an activity to the corresponding record in Marketo.

3. Send 'Clicked Link on Web Page' event for any user clicks that occur on links."[17]

56.    The Munchkin Tracking Code must be embedded into a website for

---

[13] MARKETO DEVELOPER GUIDE, WHAT IS ADOBE MARKETO ENGAGE? (last updated Sept. 19, 2025), available at https://experienceleague.adobe.com/en/docs/marketo/using/getting-started/what-is-adobe-marketo-engage (emphasis added).

[14] *See, e.g.*, MARKETO DEVELOPER GUIDE, JAVASCRIPT API (last updated Sept. 28, 2025), available at https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/javascript-api ("Marketo's Munchkin JavaScript tracking code is key to the capabilities of Marketo.").

[15] MARKETO ENGAGE, MUNCHKIN (last updated Nov. 25, 2024), available at https://experienceleague.adobe.com/en/docs/marketo/using/product-docs/administration/setup/munchkin (emphasis added).

[16] MARKETO ENGAGE, LEAD TRACKING API (last updated Sep. 28, 2025), available at https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/leadtracking/lead-tracking?lang=en.

[17] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                21

Adobe to track users.[18] Indeed, "there are a few steps [Defendant] need[s] to complete"[19] to set up Marketo Engage. "These steps include:

- Branding your Landing Page URLs and email links to improve trust and deliverability[;]

- Configuring protocols for Marketo Engage[;]

- Syncing your CRM [or Customer Relationship Management[;] [and]

- **Adding tracking code** to your corporate website[.]"[20]

57.    What is more, Marketo Engage can be integrated with other Adobe tracking technologies.[21]

58.    For example, Adobe explains that it "[a]llows you to sync static lists of known people from Marketo Engage to multiple AEC [Adobe Experience Cloud] applications, … This integration includes: Adobe Analytics, Adobe Target, Adobe Experience Manager, Adobe Audience Manager and Adobe Advertising Cloud."[22]

---

[18] *See* MARKETO ENGAGE, LEAD TRACKING API (last updated Sep. 28, 2025), available at https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/leadtracking/lead-tracking?lang=en ("Your Marketo instance automatically provides pre-configured tracking code snippets to embed code on your external pages which track activity back to your Marketo instance.").

[19] MARKETO ENGAGE, SETUP STEPS (last updated Sep. 21, 2025), available at https://experienceleague.adobe.com/en/docs/marketo/using/getting-started/initial-setup/setup-steps.

[20] *Id.* (emphasis added).

[21] *See, e.g.*, MARKETO DEVELOPER GUIDE, ADOBE EXPERIENCE CLOUD INTEGRATIONS OVERVIEW (last updated Sept. 21, 2025), available at https://experienceleague.adobe.com/en/docs/marketo/using/product-docs/adobe-experience-cloud-integrations/adobe-experience-cloud-integrations-overview ("Adobe offers a robust demand marketing solution, starting with native audience syncing across the Adobe Experience Cloud products.").

[22] MARKETO ENGAGE, ADOBE EXPERIENCE CLOUD INTEGRATIONS OVERVIEW (last updated Sept. 21, 2025), available at https://experienceleague.adobe.com/en/docs/marketo/using/product-docs/adobe-experience-cloud-integrations/adobe-experience-cloud-integrations-overview (emphasis added).

---

59. Indeed, Defendant has integrated additional Adobe tracking technologies into its Website, including the Adobe Experience Cloud Identity Service. *See infra*, § VII.

60. When Adobe uses its wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. Instead, Adobe—a separate and distinct entity from the parties to the conversations— uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party. Adobe, itself, collects the contents of said conversations. That data is then analyzed by Adobe before being provided to any entity that was a party to the conversations (like Defendant).

61. Adobe has the capability to use the contents of conversations it collects through its wiretaps for its own purposes.

## VI. Defendant Aids, Agrees With, Employs, and Otherwise Enables Adobe to Wiretap Californians' Communications

62. Adobe, as enabled by Defendant, contemporaneously intercepts and/or otherwise obtains the following communications of users of Defendant's Website. Likewise, Defendant discloses the following communications of users to Adobe. The highlights in the below transmissions show communications on the Website.

63. As shown by the highlights in the below screenshot of the Website transmissions, Adobe intercepts and/or otherwise obtains the fact that users clicked to find care (here, "care/locations"). These communications are the product of button clicks on Screen 1.

///

///

///

///

///

_mchNc          1762360983201
_mchHr          https://www.optum.com/en/care/locations.html
_mchId          243-DKH-914
_mchTk          _mch-optum-com-17213067c5e54685fab0718b1759e0b5
_mchCn
_mchHo          www.optum.com
_mchPo
_mchRu          /en/
_mchPc          https:
_mchVr          164
_mchEcid        075361B6524D9C810A490D4C@AdobeOrg:9:3947988231178934413354121674545
                4359694;8E391C8B533058250A490D4D@AdobeOrg:9:41266519663482534634515473967954646292

64.    As shown by the highlights in the below screenshot of the Website transmissions, Adobe intercepts and/or otherwise obtains the particular state that users selected to find care (here, "optum-california"). These communications are the product of button clicks on Screens 2B and 2C.

_mchNc          1762361528841
_mchHr          https://www.optum.com/en/care/locations/optum-california/find-care.html
_mchId          243-DKH-914
_mchTk          _mch-optum-com-17213067c5e54685fab0718b1759e0b5
_mchCn
_mchHo          www.optum.com
_mchPo
_mchRu          /en/care/locations.html
_mchPc          https:
_mchVr          164
_mchEcid        075361B6524D9C810A490D4C@AdobeOrg:9:3947988231178934413354121674545
                4359694;8E391C8B533058250A490D4D@AdobeOrg:9:41266519663482534634515473967954646292

65.    As shown by the highlights in the below screenshots of Website transmissions, Adobe intercepts and/or otherwise obtains the fact that users typed a search inquiry into the search bar and clicked search (here, "search-results"; "query=chest+pain"). Also as shown by the below highlights, Adobe intercepts and/or otherwise obtains the fact that users select a care category (here, "search-results"; "query=primary+care"). These communications are the product of typing and button clicks on Screen 3.

| _mchNc  | 1762361620018 |
| _mchCn  | |
| _mchId  | 243-DKH-914 |
| _mchTk  | _mch-optum-com-17213067c5e54685fab0718c1759e0b5 |
| _mchHo  | www.optum.com |
| _mchPo  | |
| _mchRu  | /en/care/locations/optum-california/find-care/search-results.html |
| _mchPc  | https: |
| _mchVr  | 164 |
| _mchEcid | 075361B6524D9C810A490D4C@AdobeOrg:9:394798823117893441335412167454545359694;8E391C8B533058250A490D4D@AdobeOrg:9:412665196634825346345154739679546462922 |
| _mchHa  | |
| _mchRe  | https://www.optum.com/en/care/locations/optum-california/find-care.html? |
| _mchQp  | query=chest+pain |

| _mchNc  | 1762370674250 |
| _mchCn  | |
| _mchId  | 243-DKH-914 |
| _mchTk  | _mch-optum-com-17213067c5e54685fab0718c1759e0b5 |
| _mchHo  | www.optum.com |
| _mchPo  | |
| _mchRu  | /en/care/locations/optum-california/find-care/search-results.html |
| _mchPc  | https: |
| _mchVr  | 164 |
| _mchEcid | 075361B6524D9C810A490D4C@AdobeOrg:9:394798823117893441335412167454545359694;8E391C8B533058250A490D4D@AdobeOrg:9:412665196634825346345154739679546462922 |
| _mchHa  | |
| _mchRe  | https://www.optum.com/en/care/locations/optum-california/find-care.html? |
| _mchQp  | query=primary+care |

66.    As shown by the highlights in the below screenshot of the Website's transmissions, Adobe intercepts and/or otherwise obtains the fact that users clicked to apply various filters (here, "entityType=p" as in provider; "gender=f" as in female"). Also as shown by the below highlights, Adobe intercepts and/or otherwise obtains the name of the particular provider that users select (here, "providers…trang-dai-eng-md" as in Trang Dai Eng, MD).  These communications are the product of button clicks on Screens 5A-5E and 6A.

///

///

///

67.    As shown by the highlights in the below screenshots of Website transmissions, Adobe intercepts and/or otherwise obtains the particular clinic users select (here, "facilities/ca/optum-arcadia"). These communications are the product of button clicks on Screen 8.



68.    As shown by the highlights in the below screenshots of Website transmissions, Adobe intercepts and/or otherwise obtains the fact that users clicked to become a patient (here, "become-patient"). These communications are the product of button clicks on Screen 10.

///

| _mchNc | 1762361880534 |
| _mchCn | |
| _mchId | 243-DKH-914 |
| _mchTk | _mch-optum.com-17213067c5e54685fab0718b1759e0b5 |
| _mchHo | www.optum.com |
| _mchPo | |
| _mchRu | /en/care/become-patient.html |
| _mchPc | https: |
| _mchVr | 164 |
| _mchEcid | 075361B6524D9C810A490D4C@AdobeOrg:9:3947988231178934413354121674545435 9694;8E391C8B533058250A4 90D4D@AdobeOrg:9:41266519663482534634515473967954646292 |
| _mchHa | |
| _mchRe | https://www.optum.com/en/care/facilities/ca/optum-arcadia-46397840.html |
| _mchQp | |

69.    As shown by the highlights in the below screenshots of Website transmissions, Adobe intercepts and/or otherwise obtains the fact that users clicked to submit their form and become a patient (here, "thank-you"). These communications are the product of button clicks on Screen 11.

| _mchNc | 1762374886487 |
| _mchCn | |
| _mchId | 243-DKH-914 |
| _mchTk | _mch-optum.com-17213067c5e54685fab0718b1759e0b5 |
| _mchHo | www.optum.com |
| _mchPo | |
| _mchRu | /en/care/become-patien/thank-you.html |
| _mchPc | https: |
| _mchVr | 164 |
| _mchEcid | 075361B6524D9C810A490D4C@AdobeOrg:9:3947988231178934413354121674545435 9694;8E391C8B533058250A490D4D@Ad obeOrg:9:41266519663482534634515473967954646292 |
| _mchHa | |
| _mchRe | https://www.optum.com/en/care/become-patient.html |
| _mchQp | |

70.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose and/or enable interception of his PII, PHI, and/or other communications. Moreover, Plaintiff was never provided with the required notice that Defendant disclosed the PHI and PII of users of the Website, nor was he provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's PHI and PII to Adobe.

71.    By law, Plaintiff is entitled to privacy in his PHI, PII, and confidential

communications.  Defendant deprived Plaintiff of his privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications, PII, and PHI; (2) disclosed patients' PHI to Adobe—an unauthorized third-party eavesdropper; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining his express written consent.  As explained in more detail *infra* § VIII, Plaintiff did not discover that Defendant disclosed his PII, PHI, and other communications to Adobe, and assisted Adobe with intercepting his communications, until November 2025.

## VII.  Defendant Enables Adobe to Pair the Above Data with Users' Identities

72.    The Adobe tracking technology at issue pairs wiretapped data (including medical information) with Website users' identities.

73.    Analysis of the Website reveals that Defendant utilizes the Adobe Experience Cloud Identity Service:



74.    The Adobe Experience Cloud Identity Service is "an integral component of many current and future [Adobe] Experience Cloud features, enhancements, and services[]"[23] that "helps[ u]niquely identif[y] a visitor on a device across multiple applications."[24]  "It works by assigning a unique, persistent ID to a site visitor[,] …

---

[23] ADOBE, ABOUT THE ID SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/about-id-service.

[24] ADOBE, EXPERIENCE CLOUD IDENTITY SERVICE OVERVIEW, https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview.

---

which can be used to link profiles and identities."[25]

75.    This unique, persistent ID set by the Adobe Experience Cloud Identity Service is called the Experience Cloud ID (ECID).[26]  According to Adobe, the ECID "provides the foundation for customer identity[]" and "is used as the primary ID for devices and as a base node for identity graphs."[27]  The ECID is "also sometimes referred to as MCID (Marketing Cloud ID)[.]"[28]

76.    In practice, "[w]hen [a website] … loads, the [Adobe Experience Cloud] ID service code checks for the AMCV cookie[.]"[29]  "If the AMCV cookie is set, the site visitor has a Experience Cloud ID. In this case, the cookie tracks the visitor[.]"[30] "If the AMCV cookie is not set, the ID service code calls a regional data collection server (DCS) at dpm.demdex.net/id[.] … In the response, the DCS returns the Experience Cloud ID (MID) and the demdex cookie."[31]  "The ID service creates and returns the MID and a demdex ID in the AMCV and demdex cookies respectively."[32]

77.    Thus, the Adobe Experience Cloud Identity Service generally "relies on the AMCV, AMCVS, and demdex cookies to function properly. These cookies are []

---

[25] ADOBE, ABOUT THE ID SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/about-id-service.

[26] ADOBE, EXPERIENCE CLOUD IDENTITY SERVICE OVERVIEW, https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview.

[27] ADOBE, ECID OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/ecid.

[28] ADOBE, AAID, ECID, AACUSTOMID AND THE ANALYTICS SOURCE CONNECTOR, https://experienceleague.adobe.com/en/docs/analytics-platform/using/compare-aa-cja/cja-aa-comparison/aaid-ecid-adc.

[29] ADOBE, HOW THE EXPERIENCE CLOUD IDENTITY SERVICE REQUESTS AND SETS IDS, https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request.

[30] *Id.*

[31] *Id.*

[32] ADOBE, COOKIES AND THE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.

---

files that store data used by the ID service."[33]  Under certain configurations, "the ID service does not return the third-party, demdex.net cookie[.]"[34]

78.    The AMCV cookie's name includes "part of [an Adobe client's] Experience Cloud organization ID[,]" and the AMCV cookie's content includes a Website visitor's "Experience Cloud visitor ID [(also known as] MID[).]"[35]  The AMCVS cookie's name likewise includes "part of [an Adobe client's] Experience Cloud organization ID[,]" and the AMCVS cookie's content simply "serves as a flag indicating that [a] session has been initialized. Its value is always 1 and discontinues when the session has ended."[36]  The Demdex cookie's "name is 'demedex'" and the Demdex cookie's content is "the demdex ID, which is generated by the DCS."[37]  Notably, "[t]he Experience Cloud ID (MID) is derived mathematically from [the] organization ID and the demdex ID. As long as these IDs remain constant, generating the right MID for a specific user is simply a math problem."[38]

79.    The Adobe Experience Cloud Identity Service is used in conjunction with the "Adobe Experience Platform Identity Service," which "piece[s] together a complete picture of [a] customer" by "link[ing] their disconnected identi[fiers,]" which Adobe calls "identities[.]"[39]  Metaphorically speaking, the "ECID and other identities" could be described as "the glue that joins different data sources together to

---

[33] *Id.*

[34] ADOBE, DISABLETHIRDPARTYCOOKIES, https://experienceleague.adobe.com/ en/docs/id-service/using/id-service-api/configurations/disable-cookies.

[35] ADOBE, COOKIES AND THE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] ADOBE, ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

build the 360-degree real-time customer profile[,]"[40] while the Adobe Experience Platform Identity Service is like the "analytical brain"[41] that makes sense of the data.

80.    "Identities" that are stitched together by the Adobe Experience Platform Identity Service include, *inter alia*: "[c]ookie IDs"[42] such as "the Experience Cloud ID (ECID)"[43]; "[c]ross-device IDs" such as "CRMID" that "tie other IDs together"; "[d]evice IDs" such as "IDFA (iPhone and iPad), GAID (Android), and RIDA (Roku)" that "identify hardware devices"; "[e]mail addresses"; and "[p]hone numbers[.]"[44]

81.    This data is presented visually in an "identity graph[,]" which is a "map of [the] relationships between [] identities" (i.e., cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, etc.) "for a single individual[.]"[45]  Ultimately, said identity graphs (and the data contained therein) can be used to gain a comprehensive "view of individual customers and their behavior"[46] and identify them

---

[40] ADOBE, COLLECT IDENTITY DATA, https://experienceleague.adobe.com/en/docs/platform-learn/implement-mobile-sdk/app-implementation/identity.

[41] ADOBE, ADOBE EXPERIENCE PLATFORM REAL-TIME CUSTOMER PROFILE: EXPLAINED WITH STICKY NOTES, https://experienceleaguecommunities.adobe.com/t5/adobe-experience-platform-blogs/adobe-experience-platform-real-time-customer-profile-explained/ba-p/432435.

[42] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[43] ADOBE, ADOBE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/home.  *See also* ADOBE, HOW THE EXPERIENCE CLOUD IDENTITY SERVICE REQUESTS AND SETS IDs, https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request; ADOBE, COOKIES AND THE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.

[44] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[45] ADOBE, IDENTITY AND IDENTITY GRAPHS OVERVIEW, https://experienceleague.adobe.com/en/docs/platform-learn/tutorials/identities/understanding-identity-and-identity-graphs.

[46] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

---

"across all applications in Adobe Experience Cloud."[47]

82.    As relevant here, Adobe pairs Website users' medical information with Website users' Experience Cloud IDs (ECIDs).  As shown by the yellow highlights in the below screenshot of the Website's transmissions, Adobe intercepts and/or otherwise obtains the medical information described *supra ¶ 66*.  As shown by the blue highlights, Adobe intercepts and/or otherwise obtains the Website user's Experience          Cloud          ID          (ECID)          (here, "39479882311789344133541216745454359694").    This is but one example; the Website user's same ECID is shown in all Website transmissions set out *supra ¶¶ 63-69*.[48]



///

///

---

[47] ADOBE, ECID OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/ecid.

[48] *See also* ADOBE, MARKETO ENGAGE AND ADOBE EXPERIENCE CLOUD: A SERIES: PART 1 - AN OVERVIEW OF MARKETO ENGAGE INTEGRATIONS WITH ADOBE EXPERIENCE CLOUD, https://nation.marketo.com/t5/marketo-whisperer-blogs/marketo-engage-and-adobe-experience-cloud-a-series-part-1-an/ba-p/328286 ("Marketo's Munchkin.js [can] attempt to capture and store Adobe ECIDs (cookies)").

---

83.    And as discussed above, the Adobe tracking technologies here at issue rely on Adobe cookies in order to identify individual website users.[49]  A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[50]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[51]

84.    Thus, together, the Adobe cookies allow Adobe Experience "help [Defendant's] website remember things when you visit again or move between pages. Cookies help track visits and tell one device apart from another."[52]

85.    The following image confirms that, when a user accesses the Website, the Adobe tracking technologies on the Website compel that user's browser to transmit several Adobe cookies, including the AMCV_, AMCVS_, at_check, mbox, _mkto_trk, s_cc, s_sq, and s_vi cookies:

///

///

///

///

///

---

[49] *See, e.g.*, ADOBE, COOKIES USED IN EXPERIENCE CLOUD, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/overview ("Adobe Experience Cloud uses cookies. A cookie is a small piece of data a website sends to your browser, which stores it for later use. Cookies help the website remember things when you visit again or move between pages. Cookies help track visits and tell one device apart from another.").

[50] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[51] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

[52] ADOBE, COOKIES USED IN EXPERIENCE CLOUD, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/overview.

---

| Name | Value | Domain | Path | Expi... | Size | Http... | Sec... | Sam... | Parti... | Cr... | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AMCVS_075361B6524D... | 1 | .optum.com | / | Sess... | 42 | | | | | | Medium |
| AMCVS_8E391C8B5330... | 1 | .optum.com | / | Sess... | 42 | | | | | | Medium |
| AMCV_075361B6524D9... | 1176715... | .optum.com | / | 202... | 265 | | | | | | Medium |
| AMCV_8E391C8B53305... | 1176715... | .optum.com | / | 202... | 265 | | | | | | Medium |
| _mkto_trk | id:243-D... | .optum.com | / | 202... | 77 | | | | | | Medium |
| at_check | true | .optum.com | / | Sess... | 12 | | | | | | Medium |
| mbox | PC#a304... | .optum.com | / | 202... | 107 | | | | | | Medium |
| s_cc | true | .optum.com | / | Sess... | 8 | | | | | | Medium |
| s_gpv_pagename | optum%... | .optum.com | / | 202... | 90 | | ✓ | | | | Medium |
| s_sq | %5B%5B... | .optum.com | / | Sess... | 17 | | | | | | Medium |
| s_vi_x60betux7Edyqx7C... | [CS]v4|3... | .omtrdc.net | / | 202... | 84 | | ✓ | None | | | Medium |

86.    The AMCV_ cookie is an Experience Cloud cookie that stores "[u]nique visitor IDs used by Experience Cloud Solutions" and has a lifespan of "13 months[.]"[53] "This cookie is used to **identify a unique visitor**[.]"[54]

87.    The AMCVS_ "[m]arketing" cookie "serves as a flag indicating that the session has been initialized" and has a lifespan of "[s]ession[.]"[55]

88.    The at_check cookie is a "test value used to determine if a visitor supports cookies" and has a lifespan of "session."[56]

89.    The mbox cookie is a targeting cookie that "[s]tores anonymous identifiers about the visitor" and has a lifespan of "two years…."[57]  It also "give[s] website operators the ability to test which online content and offers are more relevant to visitors."[58]

---

[53] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/experience-cloud.

[54] *Id.* (emphasis added).

[55] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[56] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[57] ADOBE, ADOBE TARGET COOKIES, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/target.

[58] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

90.     The _mkto_trk tracking cookie a "Munchkin cookie[]" and has a lifespan of "2 years (730 days)."[59]  "This tracking cookie allows a website to link visitor behaviour to the recipient of an email marketing campaign, to measure campaign effectiveness."[60]

91.     The s_cc cookie "[d]etermines if cookies are enabled" and has a lifespan of "[s]ession."[61]

92.     The s_sq cookie "contains information about the previous link clicked by the visitor" and has a lifespan of "[s]ession."[62]

93.     The s_vi analytics cookie "[c]ontains a **unique ID to identify a user**" and has a lifespan of "2 years[.]"[63]

94.     Adobe clients like Defendant disclose this information to Adobe so that Adobe can "power[] cross-device features and solutions" including, *inter alia*, "visualiz[ing] the paths that consumers take across [] website and apps and with any device"; "optimiz[ing ] experiences with A/B and multivariate testing"; "better forecasting"; and "provid[ing] more accurate people-based attribution allowing [clients] to develop [advertising] messages for people instead of devices."  In sum, Adobe purports to "help[] marketers know their customers more fully" and "market to real people as opposed to devices."[64]

---

[59] ADOBE, LEAD TRACKING API, https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/leadtracking/lead-tracking?lang=en.

[60] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[61] ADOBE, ADOBE ANALYTICS COOKIES, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics.

[62] *Id.*

[63] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html (emphasis added).

[64] https://experienceleaguecommunities.adobe.com/t5/adobe-experience-platform-blogs/adobe-experience-platform-s-identity-service-how-to-solve-the/ba-p/431607

## VIII. Tolling

95.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Adobe tracking technologies into its website.

96.    The Adobe tracking technologies on Defendant's website were entirely invisible to a website visitor. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and/or ignorant to information essential to pursue their claims, and thus could not reasonably discover Defendant's deception and/or unlawful conduct.

97.    Defendant had exclusive knowledge that its Website incorporated the Adobe tracking technologies yet failed to disclose to users, including Plaintiff and Class Members, that, by searching for medical care and/or filling out a form to become a patient, Plaintiff's and Class Members' personal information would be disclosed or released to Adobe.

98.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' personal information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their personal information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

99.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

100.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

101.    Plaintiff first discovered that Defendant had collected and shared his personal information without his consent in or around November 2025 after contacting

1    undersigned counsel and discussing potential claims against Defendant.

2    **CLASS ALLEGATIONS**

3    102.   Plaintiff seeks certification of the following class: all persons in the

4    United States who, during the class period, had their PII and/or PHI improperly

5    intercepted by or otherwise disclosed to Adobe, as a result of using the Website (the

6    "Class" or "Nationwide Class").

7    103.   Plaintiff also seeks to represent a subclass consisting of all California

8    residents who, during the class period, had their PII and/or PHI improperly intercepted

9    by or otherwise disclosed to Adobe, as a result of using the Website (the "Subclass"

10   or "California Subclass") (the Class and Subclass collectively, the "Classes").

11   104.   Plaintiff reserves the right to modify the Class definition, including by

12   using subclasses, as appropriate based on further investigation and discovery obtained

13   in the case.

14   105.   The "Class Period" is the time period beginning on the date established

15   by the Court's determination of any applicable statute of limitations, after considering

16   of any tolling, concealment, and accrual issues, and ending on the date of entry of

17   judgement.

18   106.   The following people are excluded from the Class: (1) any Judge

19   presiding over this action and members of her or her family; (2) Defendant,

20   Defendant's subsidiaries, parents, successors, predecessors, and any entity in which

21   Defendant or its parents have a controlling interest (including current and former

22   employees, officers, or directors); (3) persons who properly execute and file a timely

23   request for exclusion from the Class; (4) persons whose claims in this matter have been

24   finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and

25   Defendant's counsel; and (6) the legal representatives, successors, and assigns of any

26   such excluded persons.

27   107.   **Numerosity/Ascertainability:** Members of the Classes are so numerous

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    37

that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes.[65] The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Adobe.

108.    **Typicality:**  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, booked a consultation on the Website, and had their confidential electronic communications intercepted and/or disclosed to Adobe.

109. **Adequate Representation:**    Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

110.    **Commonality and Predominance:**    There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; CIPA §§ 631 and 632; Cal. Civ. Code § 56.10, and Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law, and whether

---

[65] Defendant states that it "serve[s] more than 3 million patients throughout Northern and Southern California." https://www.optum.com/en/care/locations/optum-california.html.

Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

111.  **Superiority:**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the Federal Wiretap Act,
### 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiff, the Nationwide Class and California Subclass)

112.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Classes.

113.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication.  18 U.S.C. § 2511(a).

114.   Further, the Federal Wiretap Act makes it unlawful for a person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the

1    information was obtained through the interception of a wire, oral or electronic

2    communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(c).

3        115.    Further, the Federal Wiretap Act makes it unlawful for a person to

4    intentionally use, or endeavor to use, the contents of any wire, oral, or electronic

5    communication, knowing or having reason to know that the information was obtained

6    through the interception of a wire, oral or electronic communication in violation of the

7    Federal Wiretap Act. 18 U.S.C. § 2511(1)(d).

8        116.    The Federal Wiretap Act protects both the sending and receiving of

9    communications.

10        117.    Among other ways, a violation of the Federal Wiretap Act occurs if a

11    person:

12        (a)    intentionally intercepts, endeavors to intercept, or
13               procures any other person to intercept or endeavor to
14               intercept, any wire, oral, or electronic communication; [or]

15        (b)    intentionally uses, endeavors to use, or procures any other
16               person to use or endeavor to use any electronic,
               mechanical, or other device to intercept any oral
17               communication[.]

18    18 U.S.C. § 2511.

19        118.    Under the Federal Wiretap Act, "any person whose wire, oral, or

20    electronic communication is intercepted, disclosed, or intentionally used in violation

21    of [the Federal Wiretap Act] may in a civil action recover from the person or entity …

22    which engaged in that violation such relief as may be appropriate."  18 U.S.C. §

23    2520(a).

24        119.    In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(b),

25    Defendant intentionally procured third-party Adobe, to intercept and endeavor to

26    intercept the electronic communications of Plaintiff and Class Members, namely the

27    transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class

28

Members via the Website. At relevant times, Defendant knew that by integrating and embedding Adobe's tracking technologies, Adobe would intercept the electronic communications of users of the Website.

120. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally intercepted, and endeavored to intercept, the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website.

121. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c), Defendant disclosed, and endeavored to disclose, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number of patients through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Adobe to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

122. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(d), Defendant used, and endeavored to use, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number of patients through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Adobe to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby

knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

123.    The following items constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    The codes and programs Adobe used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers and mobile applications;

c.    Plaintiff's and Class Members' computing and mobile devices;

d.    The codes and programs used by Adobe to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser or application to visit Defendant's Website; and

e.    The plan Adobe carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using Defendant's Website.

124.    The patient communication information that Defendant permitted Adobe to intercept, and that Defendant otherwise disclosed to Adobe, via Defendant's integration of the Adobe tracking technology on the Website—including but not limited to: the state where users are seeking care, the particular search queries and care categories selected by users, the preferred gender of the doctor they wish to see, the name of the doctor they select, the particular facility they select, and that users actually complete and submit forms to become patients—constitutes the contents of electronic communication because it includes detailed URL requests and button clicks that contain information Plaintiff and the Classes actively inputted into the Website.

125.   The transmissions described above were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

126.   Adobe was not an authorized party to the communications between Plaintiff and Class Members, on the one hand, and Defendant, on the other, because Plaintiff and Class Members did not know that these third parties were surreptitiously intercepting the data at issue and did not knowingly send any communications to Adobe.

127.   Plaintiff and Class Members did not consent to Defendant's conduct of: (1) procuring Adobe to intercept and endeavor to intercept their confidential communications; (2) intercepting their confidential communications; (3) disclosing their confidential communications under circumstances that violated the Federal Wiretap Act; and (4) using their confidential communications under circumstances that violated the Federal Wiretap Act.

128.   Defendant intentionally intercepted and endeavored to intercept Plaintiff's and Class Members' communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, violation of the CIPA, the CMIA, and the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6(a)(3), among others.

129.   HIPAA imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party. *See* 42 U.S.C. § 1320d-6.   HIPAA defines IIHI as:

> [A]ny information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical

or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

130.   Defendant was not acting under color of law in intercepting and endeavoring to intercept Plaintiff's and Class Members' communications.

131.   Defendant and Adobe intercepted and endeavored to intercept the communications of Plaintiff and Class Members made via the Website while those communications were in transit, as opposed to being in storage.  Indeed, Defendant and Adobe intercepted and endeavored to intercept the communications of Plaintiff and Class Members in real time and contemporaneously with Plaintiff and Class Members engaging in those communications.

132.   After intercepting the communications, Adobe used the contents of the communications to provide Defendant with analytics and marketing services, as well as for its own business purposes.

133.   As a result of the above actions, Plaintiff and Class Members have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520.  As such, Plaintiff and Class Members are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

///

///

**COUNT II**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the Subclass)**

134.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

135.    Plaintiff brings this Count individually and on behalf of the members of the Subclass.

136.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

137.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

138.    Adobe's tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

139.    Adobe is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Adobe has the capability to use the wiretapped information for its own purposes.  Accordingly, Adobe has been a third party to any communications between Plaintiff and Subclass Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

140.    At all relevant times, through its tracking technology, Adobe willfully and without the consent of all parties to the communication, and/or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

141.    At all relevant times, Adobe used or attempted to use the communications intercepted by its tracking technologies for its own purposes.

142.   At all relevant times, Defendant aided, agreed with, employed, permitted, and otherwise enabled Adobe to wiretap Plaintiff and Subclass Members using Adobe's tracking technology and to accomplish the wrongful conduct at issue here.

143.   Plaintiff and Subclass Members did not provide their prior consent to Adobe's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications.   Nor did Plaintiff and Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, and otherwise enabling Adobe's conduct.

144.   The wiretapping of Plaintiff and Subclass Members occurred in California, where Plaintiff and Subclass Members accessed the Website, and where Adobe—as enabled by Defendant—routed Plaintiff's and Subclass Members' electronic communications to Adobe's servers.

145.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

<u>**COUNT III**</u>
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiff and the Subclass)**

146.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

147.   Plaintiff brings this Count individually and on behalf of the members of the Subclass.

148.   CIPA § 632(a) provides for liability where an entity:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

149.   Adobe's tracking technologies are "electronic amplifying or recording device[s]." *Id.*

150.   Cal. Civ. Code § 56.05(j) states:

"Medical information" means any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment.

151.   Per Cal. Civil Code § 56.10(a):

A provider of health care, … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c).

152.   Per Cal. Civ. Code § 56.10(d):

Except to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient.

153.   Here, Website users' communications with Defendant—made while searching for medical care via the Website—contain sensitive and confidential "[m]edical information," as defined by Cal. Civil Code § 56.05.

154.   First, the communications include "individually identifiable information[.]" Cal. Civil Code § 56.05. Defendant enables Adobe to identify individual Website users with Marketo Engage, the Munchkin Tracking Code, the Adobe Experience Cloud Identity Service, and Adobe Cookies, which collect and

utilize, *inter alia*, persistent identifiers, cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, and identify graphs, which, "alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05.

155.   Second, Website users' communications with Defendant relate to "a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05. Adobe intercepts and/or otherwise obtains Website users' button clicks or typing selecting the state where they are seeking care, the particular search queries and care categories selected by users, the preferred gender of the doctor they wish to see, the name of the doctor they select, the particular facility they select, and that users actually complete and submit forms to become patients.

156.   Thus, Adobe—as aided by Defendant—intercepted "medical information," which is confidential, under Cal. Civil Code § 56.10.

157.   When communicating with Defendant, Plaintiff and Subclass Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 56.10. Thus, Plaintiff and Subclass Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other third-party entities like Adobe would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

158.   Plaintiff and Subclass Members did not consent to Adobe's actions. Nor have Plaintiff or Subclass Members consented to Adobe's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

159.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks

statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT IV
### Violation of the California Confidentiality of Medical Information Act
### Cal. Civ. Code § 56.10
### (On Behalf of Plaintiff and the Subclass)

160.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

161.   Plaintiff brings this Count individually and on behalf of the members of the Subclass.

162.   Under the CMIA, providers of health care are prohibited from disclosing medical information relating to their patients, without a patient's authorization.

163.   Additionally, "[e]xcept to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d).

164.   Medical information means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment."  Cal. Civ. Code § 56.05(j).  "'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id*.

165.   Cal. Civ. Code § 56.06(a) defines a provider of health care as "[a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual[.]"

166.   Plaintiff and Subclass Members are patients under the definition of the CMIA because Plaintiff and Subclass Members received "health care services from a provider of health care," and the information Defendant disclosed and/or shared to Adobe was "medical information pertain[ing]" to Plaintiff and Subclass Members. Cal. Civ. Code § 56.05(m).

167.   Defendant is a provider of health care under Cal. Civ. Code § 56.06(a) because it is an organization designed to provide patients with access to health care and provides a Website from which patients can manage their diagnosis or treatment of their medical conditions.  Because Defendant is deemed a provider of health care, it has an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

168.   Defendant is also a provider of health care under Cal. Civ. Code § 56.05(d) because it is a business that offers a mental health digital service to a consumer for the diagnosis, treatment, or management of a medical condition.

169.   As set forth hereinabove, Defendant enables Adobe to identify individual Website users with Marketo Engage, the Munchkin Tracking Code, the Adobe Experience Cloud Identity Service, and Adobe Cookies, which collect and utilize, *inter alia*, persistent identifiers, cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, and identify graphs, which are identifiers sufficient to allow identification of an individual.  Along with these identifiers, Defendant disclosed and/or shared to Adobe several pieces of information regarding its patients'

use of its Website, which, on information and belief, included, but is not limited to: the state where they are seeking care, the particular search queries and care categories selected by users (related to the type of medical care they are seeking), the preferred gender of the doctor they wish to see, the name of the doctor they select, the particular facility they select, and that users actually complete and submit forms to become patients.

170.   This patient information is derived from a provider of health care regarding patients' medical treatment and mental condition.   Accordingly, it constitutes medical information pursuant to the CMIA.

171.   However, as demonstrated hereinabove, Defendant fails to obtain its patients' authorization for the disclosure of medical information to Adobe, which is done for advertising and analytics purposes.

172.   Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires.   Accordingly, the information set forth in Defendant's Privacy Policy does not qualify as a valid authorization.

173.   Based on the above, Defendant violated the CMIA by disclosing and sharing its patients' medical information to Adobe, along with Marketo Engage, the Munchkin Tracking Code, the Adobe Experience Cloud Identity Service, and Adobe Cookies, which collect and utilize, *inter alia*, persistent identifiers, cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, and identify graphs, while failing to obtain patients' valid authorizations for the disclosure of medical information.

174.  Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information.  Cal. Civ. Code § 56.35.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.  Cal. Civ. Code § 56.36.

## COUNT V
### Invasion of Privacy Under California's Constitution
### (On Behalf of Plaintiff and the Subclass)

175.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

176.  Plaintiff brings this Count individually and on behalf of the members of the Subclass.

177.  Plaintiff and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and PHI; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites and mobile applications without being subjected to wiretaps without Plaintiff's and Subclass Members' knowledge or consent.

178.  At all relevant times, by installing and embedding Adobe tracking technologies into the Website so that Adobe could intercept and/or otherwise obtain users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Subclass Members' privacy rights under the California Constitution.

179.  Plaintiff and Subclass Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable Adobe's interception of this sensitive information given that Defendant did not provide Plaintiff and Subclass Members with the required notice of its practice of disclosures.

180. Plaintiff and Subclass Members did not authorize Defendant to record and transmit Plaintiff's and Subclass Members' private medical communications alongside their personally identifiable health information.

181. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

182. Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

## COUNT VI
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff, the Nationwide Class and California Subclass)

183. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

184. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their health conditions and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites and applications without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

185. At all relevant times, by installing and embedding the Adobe tracking technologies into the Website, so that Adobe could intercept users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights by intruding into their private place, conversation or matter. Defendant's actions amount to an intrusion upon Plaintiff's and Class Members' privacy because Plaintiff and Class Members did not consent to the particular conduct that Defendant engaged in—

allowing Google to intercept their sensitive conversations related to their health concerns and treatment.

186.   Plaintiff and Class Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable third party interception of this sensitive information given that Defendant did not provide Plaintiff and Class Members with the required notice of its practice of disclosures.

187.   Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information.

188.   This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private health condition and treatment communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

189.   Accordingly, Plaintiff and Class Members seek all relief available for Defendant's intrusion upon their seclusion.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.  For a determination that this action is a proper class action;

    b.  For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

    c.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

    d.  For an order finding in favor of Plaintiff, the Class, and Subclass on all counts asserted herein;

    e.  For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass

Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.  For punitive damages, as warranted, in an amount to be determined at trial;

g.  For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h.  For prejudgment interest on all amounts awarded;

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k.  For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 9, 2025        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _/s/ Ines Diaz Villafana_

Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

*Attorney for Plaintiff*